**AFFIRMED and Opinion Filed October 6, 2021**



In The

# Court of Appeals
## Fifth District of Texas at Dallas

### No. 05-20-00519-CV

## IN RE COMMITMENT OF VICTOR DEWAYNE JACKSON

**On Appeal from the 291st Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. CV1970005**

## MEMORANDUM OPINION ON REHEARING

Before Justices Molberg, Goldstein, and Smith
Opinion by Justice Goldstein

On the Court's own motion, our opinion and judgment of August 12, 2021 is vacated and withdrawn. The following is now the opinion of the Court. Victor Dewayne Jackson appeals the trial court's judgment civilly committing him for treatment and supervision pursuant to the Texas Civil Commitment of Sexually Violent Predators Act ("SVP Act"). Jackson raises three issues on appeal. In his first and second issues, Jackson argues the evidence is legally insufficient to prove that he is a sexually violent predator due to infirmities in expert opinion offered by the State. In his third issue, Jackson asserts the evidence is factually insufficient to support the jury's finding that he is a sexually violent predator. The State argues that Jackson failed to preserve error on his first two issues, and that the evidence is

both legally and factually sufficient to support the trial court's judgment. Civil commitment constitutes a significant deprivation of liberty mandating due process protections. Upon a review of the entire record, we affirm.

## I.     SVP Act Commitment Standards[1]

A civil commitment proceeding under the SVP Act ("SVP case") incorporates the "beyond a reasonable doubt" burden of proof typically reserved for criminal cases. *In re Commitment of Fisher*, 164 S.W.3d 637, 641 (Tex.), *cert. denied*, 546 U.S. 938 (2005). In a suit to commit a person as a sexually violent predator, the State must prove beyond a reasonable doubt that the person "(1) is a repeat sexually violent offender" who "(2) suffers from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence." TEX. HEALTH & SAFETY CODE ANN. §§ 841.003(a), 841.062(a). A person is a "repeat sexually violent offender" if he has been convicted of more than one sexually violent offense and a sentence was imposed for at least one of the offenses. *Id*. § 841.003(b); *see also id*. § 841.002(8) (defining "sexually violent offense"). The SVP Act defines "behavioral abnormality" as "a congenital or acquired condition that, by affecting a person's emotional or volitional capacity, predisposes the person to commit a sexually violent offense, to the extent that the person becomes a menace to the health

---

[1] The record is silent as to the requisite statutory evaluation process that preceded the case before us and therefore is not addressed in this opinion. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 841.001–841.153.

and safety of another person." TEX. HEALTH & SAFETY CODE ANN. § 841.002(2). A "predatory act" is "an act directed toward individuals, including family members, for the primary purpose of victimization." *Id.* § 841.002(5).

## II.  Background

Jackson was twice convicted and sentenced for sexually violent offenses:

- On October 25, 1985, in Cause No. 0244657D by the Criminal District Court No. 3 of Tarrant County, Texas, for aggravated sexual assault and sentenced to 10 years confinement in the Texas Department of Corrections.

- On October 4, 1990, in Cause No. F90-03102-KU by the 291st Judicial District Court of Dallas County, Texas, for aggravated sexual assault with a deadly weapon, enhanced and sentenced to lifetime confinement in the Texas Department of Corrections.

Jackson committed his first aggravated sexual assault on March 20, 1984, when he was 15 years old. The record reflects that Jackson went to a woman's apartment, claiming he was sent to touch up paint and collect money. Once Jackson was inside, he asked whether other people were there or would be there soon. The woman became upset and argumentative, and something in Jackson snapped. He forced the woman into a closet, physically and sexually assaulted her, choked her with a belt and with his hands, bit her and struck her in the face with his fist, threatened her with a knife, and left her unconscious. The victim was a stranger and Jackson did not know whether the woman was dead or alive when he left. Jackson waived a jury trial and pled guilty to sexual assault and attempted murder by choking with a belt. He began a ten-year prison sentence on March 25, 1985, and served

–3–

approximately four years before being released on parole in April 1989. Jackson believed he would never sexually reoffend.

Approximately one year into his parole, Jackson pled not guilty to committing a second sexual assault with a deadly weapon on April 26, 1990. A jury found Jackson guilty and sentenced him to life in prison without parole. He was 21 years old. Jackson admits that he ostensibly went to recover some of his belongings from the home of his child's grandmother but planned to physically assault her as punishment for allegedly mistreating children. Evidence reveals that, once inside, Jackson punched her in the face, dragged her into a bedroom, and raped her. Jackson held a knife to her throat and threatened to kill her. He tied her up with a telephone cord, but she managed to free herself. Jackson again physically assaulted her, retrieved a hammer and threatened to "bash her skull" if she moved, tied her up again, and then took a copier from the house and left.

The case was tried before a jury. Two experts and Jackson testified. In the charge, the jury was provided statutory definitions of "sexually violent predator," "repeat sexually violent offender," "behavioral abnormality," "predatory act," and "sexually violent offense." The trial court granted a directed verdict that Jackson was a "repeat sexually violent offender" on the ground that uncontested evidence showed that Jackson previously was convicted and sentenced for more than one sexually violent offense. A unanimous jury found the State proved beyond a reasonable doubt that Jackson is a "sexually violent predator." The court entered

–4–

judgment civilly committing Jackson for sex-offender treatment and supervision by the Texas Civil Commitment Office. Jackson timely filed a motion for new trial and a notice of appeal.

## III. Specific Legal Insufficiency Arguments

In his first appellate issue, Jackson argues the trial record reveals that Dr. Clayton's opinion is not competent evidence because he intruded upon the province of the jury by incorrectly asserting the law mandates use of his definition of "likely." In his second issue, Jackson asserts that Dr. Gaines's opinions are baseless, conclusory, and amount to no evidence because Dr. Gaines's trial testimony revealed her opinion was not based on the statutory definition of "behavioral abnormality."

### A. Error Preservation

The State asserts that Jackson failed to preserve error on Issues One and Two because he made no objection at trial to the admissibility or reliability of either expert witness's testimony, his motion for directed verdict merely asserted the State had not met its burden of proof, and his motion for new trial offered no argument supporting his conclusion that the evidence was legally insufficient. Jackson's motion for new trial challenged the legal and factual sufficiency of evidence to support findings that he suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence, that he has serious difficulty controlling his behavior, and that he is a sexually violent predator as statutorily defined. The motion also challenged the competence of expert opinion regarding

Jackson's likelihood of reoffending, and as the statute fails to define "likely," contended it is void, unconstitutional, and rendered the expert opinion a guess as to the term's meaning.

Complaints of legal and factual insufficiency of evidence raised in a motion for new trial generally are preserved for review. TEX. R. APP. P. 33.1(a); TEX. R. CIV. P. 324(b); *In re Commitment of Ratliff*, No. 05-16-01425-CV, 2018 WL 3829264, at *2 (Tex. App.—Dallas Aug. 13, 2018, no pet.) (mem. op.). Under a legal sufficiency analysis, an expert's opinion constitutes no more than a mere scintilla of evidence if the opinion is not reliable under the same standards that govern admissibility, is speculative or conclusory on its face, or is based on unfounded assumptions. *Gunn v. McCoy*, 554 S.W.3d 645, 662–63 (Tex. 2018) (citing *Coastal Transp. Co., Inc. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 233 (Tex. 2004)). A distinction exists between challenges to an expert's scientific methodology and no-evidence challenges alleging the face of the record demonstrates that expert opinion lacks probative value. *City of San Antonio v. Pollock*, 284 S.W.3d 809, 817 (Tex. 2009). When expert opinion is admitted in evidence without objection, it may be considered probative evidence even if the basis for the opinion is unreliable. *W & T Offshore, Inc. v. Fredieu*, 610 S.W.3d 884, 899 (Tex. 2020) (citing *Pollock*, 284 S.W.3d at 818). When a reliability challenge requires evaluation of the underlying methodology, technique, or foundational data used by an expert, failure to object at trial waives appellate review

because the trial court should conduct this analysis. *Pollock*, 284 S.W.3d at 817; *Gunn*, 554 S.W.3d at 661–62. Failure to object does not waive legal sufficiency challenges to the reliability of expert opinion where there is no need to go beyond the record to test whether the opinion is conclusory or speculative on its face, contains fatal gaps in analysis, or is simply incorrect. *See Pollock*, 284 S.W.3d at 817–18; *Gunn*, 554 S.W.3d at 662. A judgment may not be supported by conclusory expert testimony, even if a party did not object to admission of such testimony, because it is considered no evidence. *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 222–23 (Tex. 2019).

While Jackson failed to object to the admissibility of the experts' testimony or the reliability of their underlying data and methodologies, his specific legal sufficiency challenges raised in Issues One and Two can be evaluated on the face of the record before us and we will address them.

B.     **Standards of Reviewing Expert Testimony**

Although expert testimony often provides valuable evidence, it is the basis of the witness's opinion rather than the witness's qualifications or bare opinions alone that can settle an issue as a matter of law; therefore a claim will not stand or fall on the mere *ipse dixit* of a credentialed witness. *Pollock*, 284 S.W.3d at 816 (citing *Coastal Transp.*, 136 S.W.3d at 232). If an expert opinion has no basis, the basis offered provides no support, or the opinion assumes facts contrary to conclusively proven facts, it is conclusory and cannot be considered probative evidence. *See*

–7–

*Gunn*, 554 S.W.3d at 662–63; *Pollock*, 284 S.W.3d at 817–18. Opinion testimony that is conclusory or speculative is "incompetent evidence" because it does not tend to make the existence of a material fact "more probable or less probable." *See* TEX. R. EVID. 401; *Pollock*, 284 S.W.3d at 816.

### 1. Issue One Analysis

Jackson contends the evidence is legally insufficient to prove he suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence because Dr. Clayton based his expert opinion on an incorrect belief that case law mandates he define "likely" as "probably or beyond a mere possibility." Jackson asserts this was harmful because Dr. Clayton invaded the jury's province to decide whether Jackson is likely to engage in future sexual violence by causing the jury to falsely believe the law mandates use of Dr. Clayton's definition.

We have addressed this argument before. While experts in prior cases have testified that the term "likely" has been *defined* by case law to mean "more than a mere possibility," this is incorrect, as neither the statute nor courts have defined "likely" in this context. *In re Commitment of Hill*, 621 S.W.3d 336, 342–43, 343 n. 3 (Tex. App.—Dallas 2021, no pet.). Even though courts have not mandated a particular definition of "likely," courts have found evidence legally and factually sufficient to support SVP findings in cases where the *expert's* working definition of

"likely" was "more than a mere possibility."[2]   This Court has stated the term 'likely' in the Act 'does not require evidence of a specific percentage of risk, and the term should not be interpreted to mean 'more likely than not.' Rather, the expert's personal definition of 'likely' goes to the weight the jury decides to give the expert's testimony.'" *Commitment of Hill*, 621 S.W.3d at 343 n.3 (quoting *Commitment of Johnson*, 2019 WL 364475, at *3) (internal citation omitted).

Here, Dr. Clayton stated his "understanding" that case law has "examined" definitions of "likely" in the context of the statute.   When given the choice between case law and a dictionary definition of "likely," Dr. Clayton testified, "I'm going by the case law on this type of evaluation," because he thought, "it's better to use how it's been defined within these evaluations."  Dr. Clayton asserted that he chooses to define "likely" in the same manner it was defined in prior expert evaluations that were found acceptable by previous courts in case law he has reviewed, and never affirmatively stated that case law mandates his or the jury's use of his proffered definition that "likely" in the context of the SPV Act means "probably or beyond a mere possibility."   Additionally, Dr. Clayton agreed that (1) the statute does not

---

[2] *See, e.g., Commitment of Hill*, 621 S.W.3d at 343–44; *In re Commitment of Mendoza*, No. 05-18-01202-CV, 2019 WL 5205710, at *7 (Tex. App.—Dallas Oct. 16, 2019, pet. denied) (mem. op.); *In re Commitment of Johnson*, No. 05-17-01171-CV, 2019 WL 364475, at *3, 6 (Tex. App.—Dallas Jan. 30, 2019, no pet.) (mem. op.); *In re Commitment of Rollings*, No. 05-17-00938-CV, 2018 WL 6695731, at *5–6 (Tex. App.—Dallas, Dec. 20, 2018, no pet.) (mem. op.); *In re Commitment of Riojas*, No. 04-17-00082-CV, 2017 WL 4938818, at *4 (Tex. App.—San Antonio Nov. 1, 2017, no pet.) (mem. op.); *In re Commitment of Terry*, No. 09-15-00500-CV, 2016 WL 7323299, at *13–14 (Tex. App.—Beaumont Dec. 15, 2016, no pet.) (mem. op.); *In re Commitment of Muzzy*, No. 09–13–00496–CV, 2014 WL 1778254, at *2–3 (Tex. App.—Beaumont May 1, 2014, pet. denied) (mem. op.).

define "likely," (2) that it would be very misleading to assign a numerical probability to Jackson's likelihood of engaging in a future predatory act, (3) that his opinion is not a prediction of Jackson's future actions, (4) that he is not an attorney, and (5) that he believes the jury is free to use the dictionary definition of "likely." As we have said, an expert's "explanation of how he 'conceptualizes' the term 'likely'" does not "render the evidence. . .legally or factually insufficient." *Commitment of Mendoza*, 2019 WL 5205710, at *7; *accord Commitment of Hill*, 621 S.W.3d at 343. After reviewing all of Dr. Clayton's trial testimony, we conclude that he did not misrepresent legal precedent when describing the working definition of "likely" he employed in reaching his opinion that Jackson meets the statutory definition of a sexually violent predator.

Jackson also contends that the term "likely" should have been defined in a manner that would ensure it does not apply to every repeat sex offender, but only to a "small but extremely dangerous group" of offenders "not amenable to traditional treatment modalities" in keeping with Section 841.001's statement of legislative purpose. We previously addressed this argument and found the legislative purpose language does not appear in the Act's "sexually violent predator" definition, thus, are not elements the State must prove. *Commitment of Johnson*, 2019 WL 364475, at *3. Citing *Commitment of Johnson* with approval, the Texas Supreme Court expressly rejected this argument, holding the legislative purpose language is not part of the statute's SVP definition and therefore is not an element the jury must find. *In*

–10–

*re Commitment of Stoddard*, 619 S.W.3d 665, 677–78 (Tex. 2020). We conclude that Dr. Clayton's testimony regarding his definition of "likely" does not render the evidence in this case legally insufficient.

### 2. Issue Two Analysis

Jackson asserts the evidence is legally insufficient because Dr. Gaines's trial testimony revealed her conclusions were based on a standard that pre-dates the SVP Act rather than the statutory definition of "behavioral abnormality," proving her expert opinion is *ipse dixit* and conclusory. Specifically, Jackson contends Dr. Gaines's testimony that the standard she uses to determine whether someone has a behavioral abnormality "has been ongoing for centuries the way a doctor approaches a patient" reveals her opinion has no basis because "a 'behavioral abnormality' is a statutory construct that did not exist prior to being written into being by the Texas Legislature."[3] To the extent Jackson suggests Dr. Gaines should have based her opinions on the Act's legislative purpose language, we are bound to reject this argument. *See Commitment of Stoddard*, 619 S.W.3d at 677–78. Jackson's argument also fails because the SVP Act does not mandate a particular methodology for experts to use in evaluating whether a person has a "behavioral abnormality." While the statutory definition was created in 1999, the field of psychiatry and the

---

[3] Jackson relies on the SVP Act's legislative purpose language and an intermediate appellate decision reversed by the Texas Supreme Court after Jackson submitted briefing in this appeal. *See In re Commitment of Stoddard*, 601 S.W.3d 879 (Tex. App.—Fort Worth 2019), *rev'd*, 619 S.W.3d 665 (Tex. 2020).

–11–

methodologies employed to diagnose the myriad of psychiatric disorders that can satisfy the SVP Act's definition of "behavioral abnormality" long pre-date the statute, as the Texas Legislature did not invent psychosis. We conclude that Dr. Gaines's statements do not establish that her opinions are baseless or legally insufficient.[4]

Accordingly, we conclude the evidence is legally sufficient and overrule Issues One and Two.

## IV.    Issue Three - Sufficiency of Evidence

In his third issue, Jackson contends the evidence is factually insufficient to support the jury's finding that Jackson is a sexually violent predator. Jackson does not challenge the directed verdict that his prior convictions establish he is a "repeat sexually violent offender," which satisfies the first element of the SVP Act's definition of a "sexually violent predator." Jackson instead challenges the evidence as factually insufficient to support the second element of the SVP definition—that he suffers from a behavioral abnormality that makes him likely to engage in a

---

[4] Jackson also contends that Dr. Gaines merely asserted that her "testimony properly relied upon and utilized the principles involved in the field of psychiatry" and, like the expert rejected in *Coble v. State*, cited to no research, books, articles, journals, or work of other forensic psychiatrists who practice in this area to support her methodology. We note the trial record reveals that Dr. Gaines offered a more detailed explanation of her methodology than Jackson portrays, that *Coble* is factually distinguishable, and that the expert in *Coble* was found lacking after the trial court conducted a gatekeeper hearing upon a timely objection. *See Coble v. State*, 330 S.W.3d 253, 270 (Tex. Crim. App. 2010). Because Jackson's failure to object at trial waived any appellate complaint that would require evaluation of Dr. Gaines's qualifications or the reliability of her underlying methodologies, and because we find that Jackson's legal insufficiency arguments based on the face of the record have no merit, the jury was entitled to consider the testimony of Dr. Clayton and Dr. Gaines as probative evidence. *See Pollock*, 284 S.W.3d at 817-18.

predatory act of sexual violence. Jackson reiterates his contention that the expert opinion is unscientific and speculative, and argues this deficiency coupled with countervailing evidence of protective factors overcomes the weight of evidence supporting the experts' conclusions that he has such a behavioral abnormality.

### A.     Standards of Review

If a party challenges both the legal and factual sufficiency of evidence, we first review for legal sufficiency and only reach a factual sufficiency review if the evidence is found legally sufficient. *Windrum v. Kareh*, 581 S.W.3d 761, 781 (Tex. 2019).   In SVP cases, we employ the criminal standard of review for legal sufficiency challenges. *Commitment of Johnson*, 2019 WL 364475, at *2.  We must view the evidence in the light most favorable to the prosecution and determine whether any rational factfinder could have found the essential elements of the crime beyond a reasonable doubt. *Commitment of Stoddard*, 619 S.W.3d at 675 (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  The Texas Supreme Court recently clarified the distinction between legal and factual sufficiency standards of review in civil cases where, as here, the burden of proof is beyond a reasonable doubt. *Commitment of Stoddard*, 619 S.W.3d at 668.  In both legal and factual sufficiency review, we presume the factfinder resolved *disputed* evidence in favor of the finding if a reasonable factfinder could do so, but we must consider *undisputed* facts contrary to a finding. *Commitment of Stoddard*, 619 S.W.3d at 676. A distinction arises in treatment of *disputed* evidence that a reasonable factfinder could *not* have credited

–13–

in favor of a finding—we disregard such disputed evidence in a legal sufficiency review, but we consider this disputed evidence in a factual sufficiency review. *Id.* (emphasis added).

## B. Legal Sufficiency Analysis

The State presented two expert witnesses—Dr. Kyle Clayton and Dr. Sheri Gaines. Dr. Clayton, a psychologist licensed in Texas since 2012, has a private practice in forensic psychology and is a clinical assistant professor of psychiatry at UT Southwestern Medical Center, where he supervises forensic psychology students and has taught classes in forensics. He has been involved in approximately 50 behavioral abnormality evaluations and has performed over 100 sex offense risk assessments. Dr. Gaines is a licensed medical doctor who is board certified both in psychiatry, and in child and adolescent psychiatry. She has been practicing forensic psychiatry for nearly 30 years and has testified in over 100 SVP cases. While asking a jury to accept expert opinion based on their status as an expert will not suffice, an expert's experience alone may provide a sufficient basis for expert testimony. *Bombardier,* 572 S.W.3d at 223, 227.

The experts each testified they followed a standard methodology that is in accordance with their training, accepted in their respective fields, and used by other evaluators performing behavioral abnormality evaluations. The methodology Dr. Clayton employed included reviewing hundreds of pages of records relevant to Jackson's case, conducting a three-to-four-hour, face-to-face interview with

Jackson, and administering and scoring risk assessments. Dr. Gaines reviewed results of the risk assessment tools Dr. Clayton administered to Jackson, reviewed relevant records, and conducted her own three-hour interview with Jackson. The records reviewed by both experts include documents from Jackson's arrests, such as offense reports and witness statements, records from his trials and incarcerations, disciplinary records, academic and occupational records, medical and psychiatric records, depositions, and prior expert evaluations. The experts both testified that the risk assessments and records relied upon are the same types of assessments and records typically relied upon by other forensic psychologists and psychiatrists. This Court previously rejected assertions that expert opinion was speculative or conclusory where the expert was licensed, experienced, followed a standard methodology, reviewed the person's records, interviewed the person, and used or reviewed testing and risk-assessment tools. *See In re Commitment of Joiner*, No. 05-18-01001-CV, 2019 WL 4126602, at *3–8 (Tex. App.—Dallas Aug. 30, 2019, pet. denied) (mem. op.); *In re Commitment of Sawyer*, No. 05-17-00516-CV, 2018 WL 3372924, at *7 (Tex. App.—Dallas July 11, 2018, pet. denied) (mem. op.).[5]

---

[5] We note without comment that numerous courts have examined Dr. Gaines's methodology for conducting behavioral abnormality evaluations and accepted her testimony as competent evidence. *See, e.g., Commitment of Joiner*, 2019 WL 4126602, at *2–8; *In re Commitment of H.L.T.*, 549 S.W.3d 656, 661–64 (Tex. App.—Waco 2017, pet. denied); *In re Commitment of Arnold*, No. 09-15-00499-CV, 2016 WL 4483181, at *7 (Tex. App.— Beaumont Aug. 25, 2016, pet. denied) (mem. op.); *In re Commitment of Gollihar*, 224 S.W.3d 843, 849–54 (Tex. App.—Beaumont 2007, no pet.).

Both doctors testified at length regarding the factual bases of their shared conclusion that Jackson has behavioral abnormalities that make him likely to engage in future predatory acts of sexual violence. They described risk factors that, if present, increase the likelihood a person will reoffend, and they discussed protective factors that militate against a predisposition to reoffend. The doctors testified that these factors arose from an accepted body of published research and are widely used in behavioral abnormality evaluations for SVP Act commitments. As each factor was discussed, the experts described specific facts relied upon in determining whether the factor applies to Jackson. We summarize the trial testimony as follows:

### 1.    Mental Health Diagnoses

While a medical diagnosis of a mental health disorder is not required evidence in SVP cases, it informs the relevant assessment whether the defendant has an abnormality affecting his emotional or volitional capacity in a way that predisposes him to sexually violent conduct. *In re Commitment of Bohannan*, 388 SW.3d 296, 304–06 (Tex. 2012), *cert. denied*, 569 U.S. 1009 (2013). Both doctors diagnosed Jackson with antisocial personality disorder based upon documentary evidence and Jackson's own statements during each of their personal interviews. Dr. Clayton explained that this disorder can affect a person's emotional or volitional capacities and is defined by prolonged, persistent difficulties with conduct, difficulties with authority, defiance, not following rules, reckless behavior, and impulsive behavior. He opined that antisocial personality disorder coupled with sexual deviancy places

a person at a higher risk to sexually reoffend because the antisocial personality does not follow rules or laws, does not care if they harm other people, and is impulsive and reckless, making them more likely to act out on feelings of anger or aggression. Dr. Clayton stated it is one of the more difficult disorders to treat and treatment is focused on the resulting behaviors because, once established by early adulthood, a person's personality cannot be changed. Dr. Clayton's review of Jackson's records revealed evidence of antisocial behaviors. Jackson exhibited behavioral difficulties in childhood and adolescence, including theft, physical altercations, and committing his first sexual offense as a juvenile. His antisocial behaviors persisted into adulthood, as Jackson was arrested multiple times for non-sexual offenses during the one-year period between being released on parole for his first sexual assault and committing his second sexual assault. Additionally, Jackson received over 200 disciplinary infractions throughout his time in prison for breaking a variety of rules, including "disciplinaries" for sexual misconduct that included inappropriate sexual relationships in prison and public masturbation toward guards. While anti-social behaviors tend to reduce over time with age, the doctors have not seen this in Jackson's case.

Dr. Clayton used the Diagnostic and Statistical Manual (DSM-V) in diagnosing Jackson with "unspecified paraphilic disorder." A paraphilic disorder is related to sexual deviancy and includes pedophilia, sexual sadism, sexual masochism, and exhibitionism. This disorder is a condition that affects a person's

emotional or volitional capacities and a person with this disorder is at a higher risk to commit a predatory act of sexual violence. Dr. Clayton diagnosed Jackson's disorder as "unspecified" because it is not restricted to one aspect of paraphilia. Jackson's disorder is characterized by sexual gratification from sexual acts against non-consenting people, exhibitionism, and sexual sadism. Dr. Clayton's diagnosis was informed by details of Jackson's sexual assaults, his sexual misconduct in prison, and interviews with Jackson. According to Dr. Clayton, Jackson's history indicates his disorder is a long standing and well-ingrained issue that will require a considerable amount of prolonged treatment to make reasonable change possible, and Jackson has not had the type of prolonged treatment necessary. The doctor opined that Jackson's continued urges to act out sexually, continued rationalization, continued poor insight, and continued sexual misconduct in prison, are all evidence that his emotional and volitional capacities are still affected by his paraphilic disorder.

Dr. Gaines diagnosed Jackson with sexual sadism disorder, which is sexual gratification derived from someone else's humiliation, embarrassment, or pain. Dr. Gaines opined that Jackson acted in a sexually sadistic manner when committing his sexual assaults and throughout his time in prison, and that his public masturbation in prison also meets the criteria for diagnosis as an exhibitionist.

### 2. Risk Assessment Tools

Dr. Clayton employed the Static-99R, which he described as the gold standard of actuarial risk measurement for predicting the likelihood of sexually offending in the future. Jackson scored a six, which falls in the highest risk range when compared to others who have been convicted of a sexual offense. Dr. Clayton also used the Risk for Sexual Violence Protocol in his evaluation of Jackson. This instrument lists numerous risk factors identified by research for sexual offending and the evaluator notes which factors are relevant to the individual being evaluated. The instrument does not yield a score, but puts the person in a category of low, moderate, or high risk of reoffending. Jackson fell into the high risk category.

Dr. Clayton scored the Psychopathy Checklist Revised (PCL-R) for Jackson. He explained that psychopathy is a rarer, more intense, and more problematic form of antisocial personality disorder, and that psychopathy affects every aspect of a person, impacting their thoughts, feelings, and behaviors. Jackson's score of 31 indicates he has a psychopathic personality style. Dr. Clayton testified the research demonstrates that psychopathy increases a person's risk for violent offending, including sexual offending, because a psychopath can very easily manipulate and fool a potential victim. Dr. Gaines agreed with Dr. Clayton's descriptions of psychopathy as a risk factor and agreed Jackson has a psychopathic personality.

### 3.    Risk Factors for Reoffending

Dr. Clayton explained that some risk factors weigh more heavily in suggesting a high likelihood of reoffending, and the doctors agreed that research indicates the two strongest predictors of sexual reoffending are the presence of sexual deviance and an antisocial personality. Jackson was diagnosed with antisocial personality disorder, psychopathic personality disorder, and more than one form of sexual deviance. Dr. Clayton pointed to facts from Jackson's first sexually violent offense suggesting sexual deviancy and antisocial traits, including offending against a stranger, offending both physically and sexually, leaving the scene and initially denying committing the crime, and eventually being convicted of aggravated sexual assault. Dr. Gaines described Jackson's use of extreme physical violence in committing his sexual crimes as "a gigantic risk factor," as Jackson used force, bit and hit his victims, threatened them with and used weapons, and choked his first victim until she was unconscious. Dr. Gaines identified other risk factors, including escalation of sexual violence and the psychological coercion used in both offenses, with Jackson entering the first home under false pretenses and taking advantage of a trust relationship to gain entry into the second.

Dr. Clayton identified the chronicity of sexual violence as a risk factor because Jackson sexually reoffended after a period of time, indicating the first sexual assault was not an isolated incident. He found it significant that Jackson committed a second sexually violent offense after being caught and convicted because most

sexual offenders do not reoffend after detection. Dr. Clayton explained that committing a second sexual assault while on parole also is consistent with antisocial psychopathy because it demonstrates Jackson's problems with supervision and inability to control his behavior, even while still being supervised. Dr. Gaines agreed that Jackson's "persistence after punishment" is significant, also identifying chronicity as a significant risk factor. Dr. Gaines observed that Jackson first offended at a very young age, itself a risk factor for repeating the behavior, and Jackson then repeated the behavior with a second sexual assault and continued his pattern of sexual misbehavior over decades in prison. She also noted that Jackson still exhibits an attitude that condones sexual violence.

The doctors agreed that Jackson's receipt of approximately 200 disciplinaries in prison for failing to follow rules, for creating disturbances, and for both threatening and assaulting inmates and prison officials is evidence of his antisocial personality. They agree Jackson's continued inability to control his sexual impulses and sexual deviancy is demonstrated by twenty-three sexual misconduct disciplinaries received from 1992 to 2017. Jackson received these for exposing himself to male and female officers, attempting and sometimes achieving an inappropriate sexual relationship with female staff, and masturbating in front of female officers. Jackson told Dr. Clayton that sometimes he masturbated in front of female guards for sexual gratification because he believed they wanted him to, but sometimes he did this to release his anger towards an aggressive or abrasive woman

–21–

to punish her. Jackson described having similar feelings as he had at the time of his sexual assaults—sexual gratification and releasing anger that he considered triggered by behavior of those he repeatedly referred to as "whorish women" he desired to punish. Dr. Clayton characterized Jackson's statements as indicative of a general objectification of women, antisocial psychopathic personality, and the risk factor of condoning sexual violence.

The doctors agreed that lying and presenting different versions of events is common for people with antisocial psychopathic personality. In his interview with Dr. Clayton, Jackson denied that he sexually assaulted his child's grandmother, but admitted that he was angry with her, went to her home with intent to and in fact physically assaulted her, held a knife to her throat, and may have wanted to kill her. Jackson maintained that he was lying in previous statements when he admitted to her rape, but told Dr. Clayton that she deserved what she got because of the way she treated children. Dr. Clayton explained that Jackson's propensity to change details of his offenses in a way he believes will benefit him speaks to his antisocial personality, his failure to take responsibility, and a lack of insight into his own behavior. Dr. Clayton opined that Jackson still displays psychopathic traits such as grandiosity, narcissism, lying, and manipulation. One example is that Jackson admits to running scams in prison and gaming the system by faking suicide attempts to secure transfers to a psychiatric unit or another facility he preferred. His last transfer was in 2018.

Dr. Clayton identified Jackson's problem with self-awareness as another risk factor for reoffending. Rather than admit he has problems that need treatment, Jackson denies or minimizes his sexual offenses, externalizes responsibility by blaming his inner rage on a desire to punish women due to mistreatment by females early in life, and rationalizes his sexual acting out as beyond his control because his anger is triggered. Dr. Clayton explained that Jackson's planned physical attack to release his rage at his child's grandmother and violent thoughts about female guards indicate the risk factor of violent ideation. Jackson admits to using masturbation to cope with stress, and Dr. Clayton characterized this as problematic due to Jackson's sexual deviancy and history of sexual offenses.

Dr. Gaines agreed that Jackson has all of the risk factors identified by Dr. Clayton. Additionally, Dr. Gaines explained that having a stranger as a victim is a risk factor because it means the pool of potential victims is very large, and that Jackson's sexual misconduct in prison aimed at male correctional officers is a risk factor because it makes his pool of potential victims even larger.

Our review of the record reveals that ample factual evidence supports the opinions of Dr. Clayton and Dr. Gaines, and therefore their conclusions cannot be characterized as conclusory or speculative. We conclude the expert testimony of Dr. Clayton and Dr. Gaines is competent evidence that the jury could rely upon in reaching their verdict. After reviewing the evidence in the light most favorable to the prosecution, we conclude any rational factfinder could have found beyond a

reasonable doubt that Jackson is a sexually violent predator as defined by the SVP Act. *See Commitment of Stoddard*, 619 S.W.3d at 675.

## C.     Factual Sufficiency Analysis

The Texas Supreme Court recently clarified the proper factual sufficiency standard of review for SVP Act cases. The Court stated:

> We hold that a properly conducted factual-sufficiency review in an SVP case requires the court of appeals to determine whether, on the entire record, a reasonable factfinder could find beyond a reasonable doubt that the defendant is an SVP. In so doing, the appellate court may not usurp the jury's role of determining the credibility of witnesses and the weight to be given their testimony, and the court must presume that the factfinder resolved disputed evidence in favor of the finding if a reasonable factfinder could do so. If the remaining evidence contrary to the finding is so significant in light of the entire record that the factfinder could not have determined beyond a reasonable doubt that its finding was true, the evidence is factually insufficient to support the verdict.

*Commitment of Stoddard*, 619 S.W.3d at 668.

Jackson contends the evidence is factually insufficient to support the jury's finding that he is a sexually violent predator because countervailing evidence of protective factors was not sufficiently credited in his favor.

While the presence of protective factors could provide evidence contrary to the jury's finding, and being over 50 years of age is statistically protective, both experts devalued the protection this offers Jackson personally because he admitted to still having sexual urges and his sexual misconduct in prison was persistent and recent. The experts agreed that having a good support system is a protective factor.

–24–

Jackson was married approximately ten years ago while in prison, and he described recent communication with his sister, brother-in-law, and mother. However, neither doctor was able to ascertain the strength of Jackson's support system as a protective factor because records indicate that Jackson's relationships have not been consistently supportive.

Jackson specifically argues the following facts should be considered protective factors strong enough to render the jury's finding that he is a sexually violent predator factually insufficient: (1) while undeterred by a four-year incarceration as a juvenile, he might now exercise control over his behavior after having served almost thirty years in prison; (2) his disciplinary infractions in prison were not serious enough to warrant prosecution and he has not committed any "sexually violent offenses" during his thirty year incarceration; (3) targeting female guards for exhibitionist masturbation is a common problem in prisons; and (4) he worked to improve himself during incarceration by attaining a GED and by participating in prison programs such as anger management and cognitive therapy.

### 1. Deterrent Effect of Time Served

Jackson argues the deterrent effect of his incarceration for almost thirty years mitigates against the finding that he is a sexually violent predator. This court has rejected this argument, observing the issue is whether a defendant meets the definition of a "sexually violent predator," not whether the experience of incarceration may have had a deterrent effect. *Commitment of Joiner*, 2019 WL

4126602, at *9 (deterrent effect of thirty-year incarceration not considered in factual sufficiency review). The notion that SVP evidence can be rendered factually insufficient by being imprisoned before more offenses could be committed improperly adds a required element to the statute because the SVP Act defines "sexually violent predator" in part as "a repeat sexual offender," which is satisfied by evidence of two convictions and at least one sentence for sexually violent offenses. *Id.*

### 2. Lack of Recidivism

The jury heard expert opinion that Jackson's receipt of over 200 disciplinaries throughout his time in prison was evidence that his antisocial and psychopathic personality disorders continue to affect his emotional and volitional capacities, and that the sexual nature of recent disciplinaries shows that he still suffers from sexual deviancy. Jackson argues his disciplinaries were received for conduct that does not meet the statutory definition of "sexually violent offense," so his failure to commit additional sexually violent offenses during his thirty-year confinement should overcome the evidence of his inability to control his behavior. Because the SVP Act requires only two sexually violent offenses to satisfy the "repeat sexual offender" element, we reject arguments that a lack of sexually violent recidivism, even during long periods of freedom, is evidence mitigating against a SVP finding. *See Commitment of Joiner*, 2019 WL 4126602, at *9 (evidence of ten-year gap between two sexual offenses when unconfined does not render SVP finding factually

–26–

insufficient); *Commitment of Mendoza*, 2019 WL 5205710, at *7–8 (rejecting similar factual insufficiency argument that exhibitionist behavior in prison not "sexually violent").

Whether a "repeat sexual offender" is likely to reoffend is not a separate element of proof in addition to whether the offender has a "behavioral abnormality" as defined by the SVP statute because the condition (behavioral abnormality) and the predisposition (likelihood) are one and the same. *Commitment of Bohannan*, 388 S.W.3d at 302–03. Thus, the only fact issue is whether a "repeat sexual offender" has a predisposition to commit a sexually violent offense due to impairments in emotional or volitional capacity–the "behavioral abnormality." *Bohannan*, 388 S.W.3d at 305. Our sister courts recognize that the prevalence of ordinary conduct is of limited value in a factual sufficiency analysis because the SVP Act does not require a percentage statement of whether a person is likely to reoffend, and the question is whether there are sufficient indicia that a person has a condition causing predisposition toward violent sexual conduct. *In re Commitment of Ausbie*, No. 14-18-00167-CV, 2021 WL 1972407, at *8 (Tex. App.—Houston [14th Dist.] May 18, 2021, no pet.) (substitute mem. op.) (rejecting argument that two offenses over eight years unconfined showed defendant exercised control 99.9993% of the time). Such an argument "belies the magnitude of violent sexual offenses. By [t]his reasoning, the captain of the Titanic might as well have boasted about how many icebergs he avoided." *See Commitment of Ausbie*, 2021 WL 1972407, at *8, (quoting *In re*

*Commitment of Woods*, No. 02-19-00155-CV, 2020 WL 3969958, at *8 (Tex. App.—Fort Worth June 11, 2020, pet. denied) (mem. op.)). We agree.

### 3. Disciplinary Infractions Commonplace

At trial, Jackson minimized the validity and serious nature of his disciplinary infractions and testified that all prisoners get disciplinaries, while Dr. Gaines testified she has evaluated many prisoners who received no disciplinaries. Jackson now argues the experts put too much weight on disciplinaries in forming their opinions and cites to evidence that it is common in prisons for inmates to target female guards for exhibitionist masturbation. Jackson's argument fails, as the Texas Supreme Court rejects factual insufficiency arguments based on the notion that the SVP Act is aimed at the "worst of the worst," making clear the Act merely "requires evidence of both repeat past sexually violent behavior and a present condition that creates a likelihood of such conduct in the future." *See Commitment of Stoddard*, 619 S.W.3d at 678. Even if public masturbation and other sexual misconduct is commonplace, this does not militate against finding the behavior is evidence that a predisposition remains that makes sexual reoffending more likely.

### 4. Education and Treatment as Protective Factors

The jury heard Jackson's testimony regarding his efforts to improve himself, including his prior participation in educational and therapeutic classes, his current participation in a sex offender treatment program, and his Christian faith. Some of Jackson's testimony was disputed, and the jury had the opportunity to weigh his

credibility. Jackson testified he took anger management classes in prison, but there also was evidence that he was offered anger management in 2014 and refused it. While Jackson received a GED and took some college courses in prison, there was evidence he was forced to discontinue some of the courses because of his behavior.

The jury heard evidence that Jackson was participating in a nine-month sex offender treatment program that he began six months before trial, which was the first time sex offender treatment was offered to Jackson. Dr. Clayton testified the goal of treatment is to teach a person to manage his deviant sexual thoughts and behaviors. Jackson testified he is not having any problems in treatment. The experts reviewed records indicating that during the educational phase, Jackson completed his assignments, participated in class, and was attentive. Treatment notes indicated that during a later phase, Jackson still had issues with being accountable to the group, sometimes creating a disturbance in therapy and sometimes deflecting from himself onto others. Jackson admitted he was reprimanded by the group for not participating, but said he was never written up for failing to participate and denied an accusation that he caused one of his peers to get a black eye. The records indicate that Jackson still rationalizes his past behaviors rather than taking full responsibility for his actions. At trial, Jackson denied the truth of facts underlying convictions for unauthorized use of a motor vehicle and drug possession occurring during his one year of parole between sexual assaults and accused authorities and prior evaluators

of lying about his statements to them. Dr. Gaines concluded that until Jackson takes full responsibility, it will be very difficult for him to succeed in treatment.

The jury heard evidence that, both before and midway through treatment, Jackson expressed that he did not need sex offender treatment. In his deposition, Jackson said he was willing to participate in the program because he had a lot to offer his peers so that they could receive the intervention necessary for them to avoid prison. Jackson told the parole board he was a "waste of beauty" and he believed he could help others overcome their sexual problems and anger. He wrote on a sex offender treatment worksheet that after he raped the first woman, he felt empowered, sexually satisfied, and "I fulfilled my fantasies to be with a white woman sexually." At trial, Jackson denied details of his sexual offenses that he previously admitted during his deposition or prior evaluations and denied the truth of the information he wrote in sex offender treatment, stating: "In order to complete the sex offender program you've got to admit to the things that are in the police report. If you don't[,] you don't leave prison, period." Jackson testified that he has no triggers that would cause him to reoffend, but he admitted a high-risk situation for him to reoffend sexually would be encountering abusive or aggressive women. He believes he is safe to be in the community because he will stay away from these women. Dr. Gaines believes that Jackson has a very limited understanding of his problems and a lot more work to do to change.

Considering research-based protective factors as well as risk factors, the doctors agree that Jackson currently suffers from a behavioral abnormality that makes it more likely he will engage in a predatory act of sexual violence. There was no contradictory expert testimony. Even though Jackson believes he won't reoffend—which he also believed the first time he was released from prison—the experts believe he has yet to complete the extensive therapeutic treatment necessary to gain an ability to control the dangerous behaviors he exhibited due to his sexual deviancy and antisocial/psychopathic personality disorder. Jackson testified before the jury and presented his evidence and arguments to the contrary. In SVP cases, the jury is the sole judge of witness credibility and the weight to be given testimony, and we may not substitute our judgment for a jury's reasonable assessment of the evidence. *Commitment of Stoddard*, 619 S.W.3d at 676 n. 12 (citing *Commitment of Johnson*, 2019 WL 364475, at *3).

Viewing the entire record in a neutral light, we conclude the evidence contrary to the verdict is not so significant that the factfinder could not have found beyond a reasonable doubt that Jackson is a sexually violent predator as defined by the SVP Act. *See Commitment of Stoddard* 619 S.W.3d at 678.

Finding the evidence factually sufficient, we overrule Issue Three and affirm the trial court's judgment.

/Bonnie Lee Goldstein/
BONNIE LEE GOLDSTEIN
JUSTICE

200519F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

### JUDGMENT

IN RE COMMITMENT OF
VICTOR DEWAYNE JACKSON

No. 05-20-00519-CV

On Appeal from the 291st Judicial
District Court, Dallas County, Texas
Trial Court Cause No. CV1970005.
Opinion delivered by Justice
Goldstein. Justices Molberg and
Smith participating.


In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.


Judgment entered this 6th day of October, 2021.